Is this admitted? Why don't we wait a moment, if we can, for counsel to... Well, we'll hear argument next in number 07-3174, SESKE, against the Merit Systems Protection Board. Mr. Chester, when you're ready. It looks like... Are you out of water here? There's water, I think, on the table over there. I'm good, thank you. But it is daunting to be following the U.S. Customs Service and the Microsoft with Doug SESKE's case. Doug SESKE is a 20-year government employee, five years as an operator repairer with the Veterans Administration in the city of Pittsburgh. The job he did, more or less, was called boiler maker in private industry, so he's a five-year boiler maker. And that is the work he's, in fact, engaging in now to ameliorate damages. But the foreperson of the boiler maker section directed that the boiler makers, four in number, three in number, dismantle a brass tank or something. They cut it up, threw it in the back, in the garbage location, dumpster. So SESKE, perhaps, it was brass, so he took it to a scrap dealer in the city of Pittsburgh three different times, right out in the open. I mean, he did this not surreptitiously, he just did it at the end of shift. Right, and he took it downtown, he sold it for $2,000. $2,000, yes. As far as he's concerned, there's nothing wrong. If somebody disagrees, somebody accuses him of some criminal activity, he hires a couple of lawyers, perhaps as a result of the legal advice, he shows up at the office and he says, here's the $2,000, $2,100, I want to give it back, and I want to resign. And my lawyers will work out the terms of the resignation. Judge, that's pretty, that's cutting to the chase, right? Close. So then he has some second thoughts, and he says, goes to the MSPB, and he says, I want to show that this is an involuntary removal case. Fair enough, you get a hearing. The typical involuntary removal case that we see, and the law recognizes, is a situation where the conditions in the workplace are so unpleasant, so adverse, that no reasonable employee would do anything but quit, but quit. For example, you can have a situation where a female in the workplace was being tormented and being treated and abused in many, many ways, verbally, physically, and asked the boss to stop doing it, and they don't, and so they quit. They say no reasonable person would stay here. So what I want to know is, what were the adverse conditions in the workplace here that drove your client to the conclusion that he had no choice but to resign? Well, Your Honor, you're describing the traditional constructive discharge in an employment law case. In this particular nexus, if there is misrepresentation and deceit on the part of the government, that is, that provides the constructive discharge sufficient to morph a parent voluntary resignation into an involuntary resignation. So what we did, he did file an MSPB appeal on his own. In fact, just for a moment, I'd like to talk about the procedural dates, which are somewhat important. On March 2nd, 2006, he was cuffed by the Veterans Administration Police, arrested on the scene, and paraded through the workplace. He did the perp walk in front of his colleagues. He was bonded, and the attorneys, Seske and the government, met at the veterans' premises on March 23rd or 24th of 2006, and negotiated, and this was the deal. A clean record, and you'll pay $2,100, but we can't do anything about the criminal matter. The criminal matter went to preliminary hearing at the end of April of 2006, and the charges were dismissed because the Veterans Police never bothered to take the simple ministerial act of being sworn as deputy sheriffs in Allegheny County, Pennsylvania, so they couldn't bring state law charges, and presumptively, for reasons that are not on the record yet, the FBI was disinterested in this type of fat situation, and the criminal charges went away. Seske said, you know, this is certainly unfair, and there was another reason the criminal charges went away. The VA police didn't bring any witnesses to the criminal matter. None. So the charges were dismissed, and Seske said, this is completely unfair. You know, he did discover other facts along the way about this. The criminal charges contained an affidavit of probable cause that said, you have shorted the government on their exclusive recycling contract, and you cost us $5,000. And in the meantime, he had heard what the contract really was, and we actually got a copy of it through Freedom of Information. We put in a request in Freedom of Information, and they gave us a copy of it within four or five days. But here was the sequence. In a timely way, within 30 days after his resignation, he files a pro se MSPB appeal. He then gets a letter from the judge saying, hey, you have 14 days or 15 days to put jurisdictional statement on the record, making non-frivolous averments that this was a constructive discharge rather than a voluntary discharge. And one of the bases could be misrepresentations and deceit. And in fact, the MSPB cases, one of them says that the misrepresentation and deceit can actually be negligent or even inadvertent, and that is non-willing. And then he did. He hired me at that point, so we scrambled. We put together an affidavit, sent it to the judge, got the contract, the so-called exclusive contract, from the agency, and discovered that the representations that it was an exclusive contract were completely false. The representations that it was a contract at all was completely false. But what is the relevance of that to his voluntary resignation? What is the relevance of that? He took... Allegedly, he took government property without authorization. And I don't know... What difference does it make whether the government had a contract or didn't have a contract as to whether he did or did not take something without authorization? Because, Your Honor, at the point where it was thrown away, it was no longer property of anyone. It was garbage. And what the government was claiming was that this valuable garbage belonged to the recycle person, and the government lost money as a result of the recycle person not getting this valuable garbage. But the problem with that is the contract had expired the year before. Putting that aside, it was a no-cost contract to the government. Nobody paid anybody any money. And, in other words, the government wasn't going to make any money on this material. Maybe the recycler could. But this all sounds to me like it is much more an argument that he had a pretty good defense to removal rather than that there was some kind of constructive removal that occurred. I mean, I understand your argument about deceit and that the case was weaker than was presented when he was originally charged. At the time that his then-counsel... But that happens frequently. I mean, you know, cases look stronger or weaker as they develop, but usually somebody in this situation has got to make an estimate at the outset as to whether they want to stand and fight or whether they want to resign, particularly in a situation where resignation can have some value to them. Now, I understand there's a separate issue with respect to whether he got full value for what he thought he was getting, i.e., the clean record. But with respect now to what you've been arguing here, to the weaker... the agency's case for removal, it's hard to stretch that, it seems to me, under our jurisprudence of involuntary resignation to cover cases, to turn that into a deceit or misleading type case. Your Honor, as you point out, there is a certain level of deceit about this quote-unquote clean record. Well, that's a separate issue. Right now, and we can address that, but right now I want to focus on... I mean, you're not suggesting, I gather, that any time a case against an employee looks much weaker when it plays out than it did in the charges, that if the employee chooses to resign as opposed to fighting the charges, that it's involuntary. Because in a lot of cases, employees ultimately win. Those wouldn't all be involuntary resignation cases, I take it. Well, Judge, what we're saying, though, is that all the information and his counsel at the time had on March 23rd of 06, when this termination agreement was negotiated, was the affidavits of probable cause and the criminal matter and the criminal charges. That's all the information they had. We just gratuitously got the contract later. They were claiming that there was a violation in breach of theft by unlawful taking of $5,000 of material that should have properly been reimbursed to the government or whatever. And then when the contract appeared, there was no contract. It had expired the year before. It wasn't an exclusive contract, and it didn't... In other words, the recycler could come or not as he wished when they called him. It didn't say that the recycler gets all the scrap rather than anybody else taking the scrap out of the garbage. In other words, the contract that appeared was completely contrary and false. No other way to put it, which made the affidavit of probable cause and the criminal matter, which is the only thing that he had to go on in terms of what does the government know, what are the facts in his case. It is so startlingly different from what the government was representing under oath to the Commonwealth of Pennsylvania that it constituted very clearly the non-frivolous allegations of misrepresentation and deceit. It was the criminal charges that constituted misrepresentation and deceit and the fact he was terminated and his own job was posted. So he applied for his own job, the facts that we were talking about a moment ago. He applied for his own job, and in the ordinary course of civil service, he would have been interviewed for his job, and he wasn't, and he knew that by the time he filed the MSPB appeal. In other words, this business of the clean record was also a double-cross. Well, of course, as I'm sure you're aware, if you represent people in this type of situation, the clean record type promises produce lots of trouble because typically the agency has a different idea of what constitutes a clean record from the employee. Just as a gloss, Your Honor, the two attorneys that represented him were his criminal defense attorneys. They didn't do labor law. There's no written contract about what's going to happen as part of the termination. I would have insisted on some minimal kind of thing other than this quote-unquote clean record, but the clean record end up not being a clean record either. Well, it depends on what you... If by that you mean there's nothing on his SF-50 that indicates that he was fired for misconduct, which is one... Go ahead. I want to use 30 seconds to explain what was procedurally very startling about this. So we put in what we believe to be about 8 or 9 non-frivolous, and I promise you they were non-frivolous, affirmance of misrepresentation and deceit. We enumerated them, referred to where they appear in the record as it existed, because remember, this record is a lot like the record on a motion for judgment on the pleadings. It's not even a summary judgment. So then the court, the MSPB judge, writes 2 or 3 months later, there are no material dispute of fact. And I said, where did this come from? In other words, we were pursuing a motion for judgment on the pleadings, so to speak, and addressing that, and suddenly it became a motion for summary judgment followed by 7 pages of dense discussion, or 8 pages of dense discussion about the facts of the case, and not addressing the alleged, not all of them addressing, not addressing all of the misrepresentation and deceit that we had raised. So the point was, I can understand that the administrative law judges have to be the gatekeepers for frivolity, but the facts that were averred were not frivolous, and we were never given an opportunity to develop them on any kind of factual basis. So I'm suggesting on that basis alone, and it was somewhat disconcerting that the government put in a letter brief, 3 fourths of a page, and the judge scoured the thing and came up with 8 pages of dense factual discussion. I mean, it was saying, what did we do wrong? Who did we insult? How did this become a factual determination where the determination under the prevailing case law, the MSPB case law would have been, is it frivolous or not? And that's not a giant hurdle. Well, there's a little more. The MSPB practice, as I understand it, doesn't quite map the federal motion to dismiss a failure to state a claim. I think it's a requirement of non-frivolous allegations supported by the production of evidence. So it's more than simply saying dismissal on the pleadings type dismissal. Yes, Your Honor. Your Honor, I cited one MSPB case, the Claxton case, which I believe, first of all, all these cases are fact-laden, and you're not going to find a lot of precedent about what went on in your case, except I think the Claxton case... Did I misread the A.J.'s decision when I took the A.J. to say, well, assuming all this is so, assuming all this is so, that there wasn't a contract or that there wasn't any injury or that the government didn't really care about this property. These are good defenses, good defenses that should have been raised. To the dismissal. The A.J. is saying, I'm dismissing all this evidence as not passing over the unfortunate word for non-frivolous standard hurdle because they're irrelevant. The facts that you're alleging as the basis for your misrepresentation and or deception, the trial, the A.J. is saying, they're irrelevant. What they are are pretty darn good arguments as to why your client may well have won if you stood and fight. Yes. But then that's tempered by the fact that the MSPB... And then what the rationale was, the fact that they are good defenses doesn't convert them into deceit and misrepresentation because essentially they're actually only allegations. There's no showing. There's no... We don't know the answer to this day from a judge as to what the contract said or didn't say. Judge, in 15 words or less, if the government tells him under oath in an affidavit that you took garbage that was valuable to us to the tune of $5,000 and when we get a copy of the contract, the contract, number one, doesn't exist. Number two, it doesn't... It's a no-cost contract to the government. They wouldn't have gotten any money anyway. Another way of what you're saying is that your client accidentally fell into the hands of lawyers less skilled than you in this field of law and made a terrible mistake by agreeing to resign, especially with no more in the protection about the clean record than he got, and that that's the real fly in the ointment in this case because if he had come to you right in the beginning... Or, Judge, put it another way. If he had gotten that actual clean record that was promised, he would have at least gotten an interview a month later when he applied for his own job. Well, that, again, depends on what the clean record is, whether it's simply an SF-50 that doesn't have anything on it. That's clean. Why don't we hear from the MSPB's counsel and we'll reserve your rebuttal time. Very well. Mr. Cardinal. May it please the Court. In this case, the petitioner removed, on three different occasions, $2,000 worth of this ever-doer scrap and sold it for approximately $2,100. He contends now that he had authorization or believed he had authorization because other people in the workplace did this and a supervisor did it as well. Let's set that part of it aside. That other people were doing it is not a very compelling argument in any setting. And there is some evidence suggesting possibly that Mr. Engler, his supervisor, at least sold scrap. But let's turn to the question of whether the agency substantially overstated the nature of the offense in the original charges and whether that can constitute a viable predicate for a claim of involuntary resignation. A couple points. If you look at what Officer Dominski said in his affidavit, he essentially quoted from the contract. The contract is in the appendix here. It has a cover page. The petitioner got the contract and I want to take you to But this is the contract that was expired? It's not expired. If you turn to page respondent's appendix, page 34 This is a cover letter that delivers a copy of the contract and it says I apologize, I just received your FOIA request. It attaches a signed copy of the contract of the rich end company, which covered the period from 2002 to September 30, 2005 and was extended for four months in the period from October 1, 2005 to March 31, 2006. So clearly the contract existed and it was extended. It was in force at the time of the events in question. Your Honor, as I said before, the statement by Officer Dominski, he refers to the contract and he essentially quotes the contract in his affidavit. Now what he did not address in his affidavit is the contention that the petitioner was authorized to remove this material. That is because when he questioned the petitioner, the petitioner told him, I did not take the material. So if he is told that he didn't take it and nobody else in that workplace said that they thought people had authorization to take scrap, there's no reason why Officer Dominski would think that people thought they had authorization to take the scrap. Essentially, the petitioner boxed himself in on this case. When he was interviewed by Officer Dominski, he told him, I didn't take the scrap. And later on, when he was talking with the agency about resignation, how could he then go back and say, you know what, I lied to Officer Dominski, I thought I had authorization. Now, where do all these facts come from? I mean, I know that the administrative judge, as is typically the case of the board's administrative judges, wrote a very thorough opinion. Where did the administrative judge gather all of these? Well, the materials were submitted by the petitioner. He had affidavits from Mr. Farrell, the attorney who wrote his affidavit. Where, for example, do we learn that the petitioner, what in the record tells us that the petitioner, for example, denied having taken the materials? If you look, the investigation by Officer Dominski begins on Respondent's Appendix... This is Dominski's investigative report? Yes, Your Honor. Respondent's Appendix 58. He talks on page 60. I interviewed the third paragraph on the bottom. February 15th, I interviewed Seske who admitted to being already made aware of the investigation. I see. The last sentence of that paragraph. Seske... I asked Seske if his supervisor told him to sell the scrap and he explained that he had never sold the scrap from the tenants. In addition, his notes from his interview with... Your Honor, there are in the record notes of Officer Dominski's interview with the petitioner in which he denied taking the scrap. Well, let's step back for a moment from the specific facts here and disputes about the facts. What I'm interested in is what do you think are the circumstances in which when we're talking about charges that result in a resignation when the charges are not, as it turns out, when the charges are overblown, let's say, maybe substantially overblown, without regard to whether that's the case here. What does it take to constitute, to make the resignation involuntary in that setting? Your Honor, if an agency takes an action or threatens to take an action that it knows it or should have reason to know it can substantiate, then there's a problem because that could induce someone to take an action to protect themselves that maybe they wouldn't otherwise take. But in this case, the petitioner never revealed his defense, so the agency was unaware. We're talking about $2,000 worth of material, three separate instances where he took that material and sold it in denial to the investigator. I don't think the charges here were overblown, and I would also point out that the dismissal of the charges in the criminal case was dismissed under, I think it's section 586 of the Pennsylvania Criminal Code, which provides for dismissal after restitution has been made. Restitution was made in the case. I'm sure that the agency lost interest in it after that point. The petitioner had resigned, they had gotten restitution, and that's why the case was dismissed, not because of some defect in the case that was originally brought by the agency. That's not going to occur in every theft case. Obviously, that doesn't apply in every theft case. I can't go into the First National Bank in Pittsburgh and rob them of $25,000 and once I'm caught, avoid prosecution simply by returning the money. This is pretty petty theft.  the clean record aspect of the case? There are affidavits, I guess, from both Mr. Seske and one of the then counsel about the exchange with the agency. HR representative? Yes, Mr. Court. The administrative judge found that Mr. Seske was promised a clean resignation, and I don't think there's any doubt that he got a clean resignation. Well, that's the question, really. Oral promise? Oral promise? The SF-50 documenting his leaving the agency says no reason given for resignation. The problem is that if you look at Mr. Seske's affidavit and his attorney's affidavit, they both also state that a clean record was promised, not just a clean resignation. And the judge, I think, got it wrong there. He said a clean resignation was promised, he got a clean resignation. It was more than that. It was promised a clean record. The problem, from the petitioner's side, is he hasn't alleged that anything was put in his record. He has this allegation that Ms. Dominski contaminated his record. Doesn't say with what, when. You know, the fact that the police, I'm sorry, that Officer Dominski's report was produced in this case and is part of the record, there's no indication that that was kept in his personnel file. There's no copy of any draft notice of proposed removal in the record. There's no indication that that's in his personnel file. The simple fact that he was not selected... Has there been discovery about what the current contents of his personnel record is? There's been no discovery. How do we know what you're telling us is the truth? The petitioner can submit a FOIA request for his personnel record to find out. But, I mean, you're just telling me a bunch of stuff about what's not in the record and I don't know, I assume you're an honest man, but I don't know. I can be skeptical. You know? The petitioner has made no factual allegation that any negative material is presently, or was maintained in his personnel file. The fact that he was not selected when he reapplied, it could be any number of reasons why a person is not selected. And the fact that he wasn't given an interview, there could have been 12 welders who had better credentials than him. I don't know. But typically in these cases, I think, you'd agree with me if I just characterize them broadly and say that there's often a disconnect between what the agency thinks it's promising and what the employee, the resigning employee, thinks he's gotten when the word clean record or some equivalent comes up. Because I think the employees typically believe, and probably in all good faith, that what that means is all institutional memory of the unpleasantness that led to the resignation will be obliterated and he will be treated as if nothing had ever happened. And the agency typically doesn't see it that way. They say, if we promise you a clean record, that means we won't have some piece of paper in your file. But we can have institutional memory, we can give you negative recommendations, we can do whatever we want, as long as they're in something in your, what do they call it, the IPF? The IPR. Your Honor, I would agree that clean resignations, clean records are a resource of controversy and difficulties. But there's no indication that any other employer ever received indication that there had been a problem in this job. I think to be removed and then to reapply for your position and complain that you, well I'm sorry, to resign upon threat of proposed removal, to reapply and then complain that you weren't given proper consideration, I've never seen that before. No, actually I've seen a couple of cases with exactly that pattern. And it's for exactly the sort of reason we have here, which is that the employee feels that the fact that he wasn't considered the second time around was either shown to be or was suspected to be, and probably was because he was the fellow that was under a cloud and everybody in the HR office knew it. Even though there wasn't anything in his file. But it's frustrating because this lack of mutual understanding seems to be just a constant companion of these kinds of cases. I suppose the answer is get it in writing and be very specific. Certainly a good idea, Your Honor. Yes. Just as to the other allegations of deception or deceit by the agency, you know, Officer Dominski's outdate, which I think is the big one, there's just nothing there. He quoted from the contract. The contract existed, the petitioner got a copy of it in his FOIA request, and the cover letter indicates that it had been extended. The contract was in effect and he said, per the contract, Mr. Pesutti, the proprietor of Riching Company, is the only person authorized to remove the scrap. That's true. Not only, and leaving alone whether there was reliance. Do we actually have the text of the contract in our record? Yes, Your Honor. You made reference to the email from Glancy to somebody. Respondents Appendix 37. The scrap contractor shall be responsible for all removal and pickup of accumulated surplus personal property consisting of ferrous and non-ferrous scrap metal, and it continues the things that can be picked up. The scrap contractor shall be responsible for all removal. In the affidavit, I'm quoting in the affidavit on page 66, Pesutti, Pesutti is the gentleman who runs the scrap contracting company, would be the only individual allowed to remove the scrap based on his contract that he has with the U.S. Department of Veterans Affairs. That's the state. It's essentially the exact same as the contract. The Court has no additional questions. Thank you, Mr. Carney. Mr. Chester? Three short and fast points, Judge. I think the facts point out the confusion here. Look, we've got this Freedom of Information Act. It said that the contract was in effect until March of 2006. No, it wasn't. I'm sorry. What they attached here was not in effect until March of 2006. That's misunderstood. In fact, the person that sent this on, the Lansing, she asked my client... What page are you on? This is RA 34. RA 34. Right after the unsubstantiated claim that the contract was in existence, she asks, we're getting ready to bid the contract again in the near future, so please let me know if you are interested in bidding. She asked my client if he wants to bid on the scrap contract that he supposedly stole the scrap metal and it just tells you what the disjunct is and what the child's worth bid. I'm sorry, but the MSPP... This is addressed to a lien. Well, it's the client's sister, actually. But the point is you know, also the contract itself on the next page was accepted, awarded four days before it was bid. I mean, the whole thing is just screwy and there's also the claim that Seske admitted that he had taken this stuff, or he was lying to the police officer. Look at RA 66. It said there was an interview of four persons and quote, they all denied any involvement. Now, I'm looking at your list of cases. I'm not thoroughly sure that this court has appellate jurisdiction over a variety of criminal matters, but when have you ever, and under any legal circumstances, heard of a joint interview of suspects in which four of them are present and the officer concludes they all denied any involvement. That's not a denial by Seske. The next line says what Seske said. I attempted to interview Seske. Seske was uncooperative and had no comment. That's what people are supposed to do when the police are targeting them. So there was no falsehood or lying on Seske's part. That's very clear from the bottom of RA 66. Well, of course, but that is only matters in this context if one infers from the entire set of circumstances that the agency was acting in a deceitful manner as opposed to acting in good faith based on the interviews and reports. In Seske's affidavit he said, I was not interviewed by the officer except on February 15th when I wouldn't talk to him. In other words, Seske denies that there was a group interview of the boilermakers on the premises. He denies, or Elsie denies he was there. And the officer's notes, well, I don't know what his notes were showing, but in short the administrative law judge took everything the government put in any written record form as being apparently true. And that's not the right way to decide these jurisdictional issues in MSPB. I respectfully submit. Very well. Was there anything else? That's all. Okay. Very well. The case is submitted. Thank both counsel.